[No. 413-1. Division One—Panel 1. August 3, 1970.]

LINDY HANSEL *et al., Respondents,* v. FORD MOTOR COMPANY, *Defendants,* R. L. MOSS *et al., Appellants.*

*Hullin, Roberts, Mines & Fite* and *John Roberts,* for appellants Moss.

*William M. Robinson,* for appellant Hopper.

*Miracle & Pruzan* and *William F. Nelson,* for respondents.

SWANSON, J.—Defendants Moss and Hopper appeal from an order of the trial court granting the plaintiffs Hansel a new trial in an action brought for personal injuries.

Nancy Moss, the defendants' daughter, was giving her friends, Lindy and Marjorie Hansel, a ride in her parents' 1964 Comet automobile after a social evening. The automobile had been purchased some 2 years earlier by her father for use in the family construction business. Having stopped for a stop sign at Marine View Drive in south Seattle, Nancy proceeded downhill toward the intersection of Marine View Drive and the Kent-Des Moines highway. The Comet's brakes suddenly failed, and the car ran into a telephone pole opposite a service station at the intersection. The Hansels were severely injured in the collision. The Comet's brakes had functioned properly during the entire period of ownership prior to the accident. Some 2 to 5 weeks before the accident, defendant Moss' mechanic, Buford H. Hopper, had relined the brakes on the automobile. In so doing, he had removed all four wheels, disassembled the brakes, replaced the lining, and inspected the brake cylinder. He said that before reassembling the parts he had inspected all of his work and found it to be in proper order.

The Hansels brought an action for damages against the Ford Motor Co., manufacturer of the automobile, claiming negligence and breach of warranty. Plaintiffs also sued the Mosses and Hopper, claiming Hopper negligently repaired the brakes on the vehicle and that such negligence caused the accident. The claim against the Mosses is predicated on the doctrine of respondeat superior. The driver of the car, Nancy Moss Robertson, was also joined as a defendant. This claim based on gross negligence was dismissed by the plaintiffs at the close of their case. Defendants Moss and Hopper

denied any negligence on the part of Hopper in repairing the brakes. They also assert the host-guest statute as a defense to the claim.

At the conclusion of the plaintiffs' case, defendants Moss, Hopper, and the Ford Motor Co. all challenged the sufficiency of the plaintiffs' evidence to make out a prima facie case. The trial court granted a challenge as to defendants Moss and Hopper, but the motion was denied as to the Ford Motor Co. That claim proceeded to a jury verdict in favor of the defendant Ford. Plaintiffs Hansel then moved for a new trial against defendants Moss and Hopper, claiming that the trial court erred in granting the motion challenging the sufficiency of the evidence. The trial court agreed, and an order granting a new trial was entered. The Mosses and Hopper appeal.

The appellants assign error to the order granting respondents Hansel a new trial. Two primary issues are raised: first, that the host-guest statute, RCW 46.08.080,[1] is applicable and is a bar to any claim against the owner of a motor vehicle brought by an invited guest without payment for such transportation; and second, that there is no substantial evidence of negligence shown by respondents' proof, so there is no issue for submission to the jury.

Considering these issues in order, appellants argue that the plain language of the host-guest statute prevents any claim against the owners of the 1964 Comet, because the Hansels were admittedly non-paying guests and were transported in Mosses' car. There is no dispute that respondents Hansel were long-time friends of the Moss fam-

[1]"No person transported by the owner or operator of a motor vehicle as an invited guest or licensee, without payment for such transportation, shall have cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless the accident was intentional on the part of the owner or operator, or the result of said owner's or operator's gross negligence or intoxication, and unless the proof of the cause of action is corroborated by competent evidence or testimony independent of, or in addition to, the testimony of the parties to the action: *Provided,* That this section shall not relieve any owner or operator of a motor vehicle from liability while it is being demonstrated to a prospective purchaser."

ily and that they were guest passengers in the automobile at the time of the accident. There is no evidence in the record of gross negligence on the part of any of the appellants. It is undisputed that Mr. Hopper, in repairing the brakes, was acting for and on behalf of the Mosses. Respondents say that the owner of the car is not entitled to the benefit of the host-guest statute if he is not driving the vehicle. Appellants argue that to so construe the statute renders the use of the term "owner" meaningless. The issue before this court is whether or not the nondriving owner of an automobile may interpose the host-guest statute as a bar to liability when he is sought to be held liable for the negligent tort of his nondriving agent. We hold that he may not.

Since shortly after its enactment in 1933, the judicially declared purpose of the host-guest statute has been to protect insurance companies from collusive suits between a host and guest. *Shea v. Olson,* 185 Wash. 143, 53 P.2d 615, 111 A.L.R. 998 (1936); *Upchurch v. Hubbard,* 29 Wn.2d 559, 188 P.2d 82 (1947). The accuracy and wisdom of this declared purpose have been questioned and criticized by commentators. In rebuttal to the collusive suit theory, W. Prosser, Torts § 34 (3d ed. 1964), states:

> Essentially, however, the theory of the acts is that one who receives a gratuitous favor in the form of a free ride has no right to demand that his host shall exercise ordinary care not to injure him. The typical guest act case is that of the driver who offers his friend a lift to the office or invites him out to dinner, negligently drives him into a collision, and fractures his skull—after which the driver and his insurance company take refuge in the statute, step out of the picture, and leave the guest to bear his own loss. *If this is good social policy, it at least appears under a novel front.*

(Footnote omitted. Italics ours.)

In recognition of the fact that the host-guest statute derogates from the common law concept of liability for one's negligently caused torts, the Supreme Court of this state has construed the statute strictly. *Brown v. Gamble,*

60 Wn.2d 376, 374 P.2d 151 (1962); *Miller v. Treat,* 57 Wn.2d 524, 358 P.2d 143 (1960). *Contra, Hardwick v. Bublitz,* 253 Iowa 49, 52, 111 N.W.2d 309 (1961). The problem before us is essentially one of construction and we follow the court's admonition.

 Appellants contend that the immunity of the statute is applicable to a nondriving owner of a motor vehicle. Respondents contend that the operative verb in the statute is "transport"; thus, the immunity is only available to an owner or operator who transports. We find this latter argument persuasive as it applies to a person transported by either the owner or his servant or agent. "Transport," says Black's Law Dictionary 1670 (4th ed. 1951), means "[t]o carry or convey from one place to another." The statute is clear; it applies to a "person transported by the owner or operator of a motor vehicle." The nondriver is not one who carries or conveys.[2] The importance of the verb "transport" is also seen in *Upchurch,* 29 Wn.2d at 566:

> We believe that the legislature meant, and that the statute should be construed to mean, that to exempt the owner or operator of a motor vehicle from liability for the injury to, or the death of, a person *transported* by him, the relationship alleged to exist between the owner or operator and the person *transported* must be a lawful one, . . .

(Italics ours.) Moreover, the statutory exceptions support this construction.

The owner or operator is excepted from the statutory immunity when he causes an accident intentionally[3] or when it is the result of his gross negligence or intoxication. We fail to see how a nondriving owner of an automobile can intentionally cause an accident. Nor would the owner's gross negligence or intoxication at home or elsewhere bring him within the immunity. The statute is clearly concerned

---

[2]When the operator is the owner's servant or agent, the owner "transports" by their acts.

[3]This statutory language creates the paradox of an intentional unforeseen event. See J. Richards, *The Washington Guest Statute,* 15 Wash. L. Rev. 87, n.3.

with the driver of a motor vehicle, whether he be the owner or just an operator.

Appellants were unable to cite any authority directly in point. Their only references were to cases concerning an owner's immunity under a guest statute for negligent entrustment of his automobile to another. *See generally,* Annot., 91 A.L.R.2d 323 (1963). A complete analysis of the opinions cited in the annotation would add little to our opinion. Suffice it to say that the authorities are divided.[4]

To the extent that the entrustment cases are relevant here, we are persuaded by the rationale advanced by the courts of Alabama and California. See *Penton v. Favors,* 262 Ala. 262, 268, 78 So.2d 278 (1955):

> [W]e do not think our statute was intended to limit the duty of the owner who entrusts to an incompetent driver an automobile or to a competent driver a defective automobile. . . . We think [the language of the host-guest statute] means to apply only to such person as may be responsible for the *manner of its operation;* that it does not apply to the *owner* unless he is operating the car in person or it is under his immediate control or is operated by his servant or agent duly authorized by him.

See also *Nault v. Smith,* 194 Cal. App. 2d 257, 272, 14 Cal. Rptr. 889, 899 (1961):

> We conclude that there is nothing inherent in the California guest statute which insulates an owner of a vehicle for his own independent negligence in entrusting it to an incompetent driver. *Benton v. Sloss, supra,* 38 Cal.2d 399, [240 P.2d 575], makes it clear that the owner as such holds no talisman against liability; the guest statute does

---

[4]For example, in Iowa, where the immunity is upheld, the court has rejected the idea that negligent entrustment is an independent ground of liability. *Hardwick,* 253 Iowa at 52:

As we understand plaintiff, he concedes the guest statute *protects* the owner and the operator, but maintains it *protects only* for negligence arising out of the *operation* of the motor vehicle, not for negligence of an owner in entrusting his vehicle to one unlicensed or incompetent to drive the car. Were it not for the rather clear and all-inclusive language used in that statute, we could almost agree with appellant's contention, for it has considerable logic and might well be the object of such legislation.

not inexorably reach backwards to exonerate the owner from his own tort.

Nor does the Washington guest statute inexorably reach backwards to exonerate the owner from responsibility for the alleged tort of his servant in negligently repairing the automobile.

■ Resolution of the correctness of the trial court's order granting a new trial for the reason that it should not have dismissed respondents' claim rests in a large measure on whether their exhibit 18 ought to have been admitted. Exhibit 18 is a polaroid photograph of the exposed braking mechanism of the left rear wheel. The photograph was identified by Mr. Hulit, respondents' identifying witness, but part of his testimony was contradicted by respondents' expert witness, C. V. Smith. The admissibility of this photograph hinges on two questions: (1) is the evidentiary link between the photograph and the Moss vehicle sufficient; and (2) is the photograph an accurate representation of the left rear wheel of the Moss vehicle? In answering these questions, we are mindful of the controlling principle that the admission or rejection of a photograph lies within the discretion of the trial court. *Toftoy v. Ocean Shores Properties, Inc.,* 71 Wn.2d 833, 431 P.2d 212 (1967), and cases cited therein. The trial court's ruling will be reversed only for abuse of discretion.

■ We consider first the question of the evidentiary connection. This question is somewhat complicated by the fact that the photographer was dead at the time of the trial. But the photographer need not authenticate the photograph. *State v. Tatum,* 58 Wn.2d 73, 75, 360 P.2d 754 (1961):

> What quantum of authentication do courts require before a photograph may be admissible in evidence? It is simply this—that some witness (not necessarily the photographer) be able to give some indication as to when, where, and under what circumstances the photograph was taken, . . .

A review of the record resolves this part of the controversy.

The Moss automobile, a 1964 Comet, was taken to the storage yard of Fitz Auto Rebuild. It was the only 1964 Comet possessed by Fitz. An investigator, the photographer, was hired by the Mosses' insurance company to examine the vehicle. Some 4 months after the accident, the investigator went to the Fitz yard, and the manager, Mr. Zeller, took him to the vehicle. A Fitz employee, Walter Hulit, removed the left rear wheel and brake drum from the Comet automobile, and the investigator took a picture. A picture showing a brake mechanism was attached to the investigator's report to the insurance company. Respondents obtained the picture from the report.

On the basis of these facts, the trial court decided that exhibit 18 was a photograph of the Mosses' 1964 Comet.

But now I come up with this evidence and this finding, I think I have to make under the evidence: The car finally has been identified in the lot of these Fitz people.

Mr. Zeller positively identified the car, and through the other related evidence here, the license number, serial number and whatnot, Mr. Zeller testified that was the only—and I emphasize only—1964 Comet automobile in their yard at the time in question.

He says he sent Mr. Hulit here over to assist a man, whom you and I know is Mr. Ketchum, in taking the wheel off.

Mr. Hulit says he took the wheel off of a 1964 Comet automobile that was in their yard. Now, that identifies the car, left rear wheel, that particular 1964 Comet automobile, which was the only one, according to the testimony of Mr. Zeller, in the yard at the time.

That's pretty definite and positive identification that he took the wheel off the Moss car.

We believe this evidence is sufficient to show that the photograph is not spurious and the trial court's discretion was properly exercised.

The second question concerns the accuracy of the photograph. This question posed the greatest problem for

court and counsel. To be admissible, a photograph must accurately portray the object photographed. *Toftoy v. Ocean Shores Properties, Inc., supra; State v. Tatum, supra; Kellerher v. Porter,* 29 Wn.2d 650, 189 P.2d 223 (1948). The critical identifying testimony of Mr. Hulit is:

Q Now, then, I am going to show you Plaintiff's Exhibit 18 for identification and ask you what that is.
A That's the left rear brake assembly of an automobile.
Q Now, then, sir, is that a reasonable representation of what you saw when you took the drum off that wheel?
A Yes, it is.

The problem with the identification is that on cross-examination, Mr. Hulit said he remembered a misplaced stretcher bar which he again saw in the photograph:

Q And you already testified that you think that is a photograph of the brake assembly of the car that you saw with this other man back in 1966?
A Yes.
Q How do you know that?
A How do I know?
Q Yes, sir.
A Well, by that stretcher bar that was down.

On cross-examination, respondents' expert gave testimony directly to the contrary:

Q Now, your view of these various pictures—I will use 49, since it is posted up here on the board.
 Do you see any evidence of the parking brake strut, which is this bar that runs across from ten o'clock to two o'clock on this photograph, do you see any evidence of this parking strut in an abnormal position?
A No, sir.
Q It looks normal to you?
A Yes, sir.

Appellants argue that the expert's testimony impeached Hulit's identification and, thus, that exhibit 18 was improperly admitted. Appellants also object to the fact that the expert was allowed to use his interpretation of the photograph as a factual predicate for his opinion theories. This

latter argument properly relates to appellants' fourth assignment of error.

Concerning appellants' impeachment argument, it must be remembered that Hulit identified exhibit 18 as a reasonable representation of what he had seen. The fact that Hulit's interpretation of the photograph was disputed merely goes to the weight of his testimony. The jury must decide whose interpretation is more credible.[5] The identifying witness must state whether or not the picture accurately portrays what he had observed. Having answered this question, it is not necessarily his function to interpret the photograph. When Hulit said the photograph showed the misplaced spreader bar which he had previously observed, the expert can testify that the spreader bar in the photograph was, in fact, in position. The jury must then decide whose testimony to believe. We do not believe the court abused its discretion in allowing exhibit 18 into evidence.

Appellants' fourth assignment of error alluded to above contends the court allowed respondents' expert to base his opinion as to the cause of the accident on his interpretation of exhibit 18. Appellants say this is basing an opinion on an opinion, which is improper. Given the rule that a hypothetical question asked of an expert witness must be predicated on facts in the record, *State v. Tyler*, 77 Wn.2d 726, 466

[5]The problem is illustrated by the story often reported in photographic circles about the merits of the Nikkor lens. See J. Cooper & J. Abbot, Nikon F—Nikkormat Handbook of Photography 1-1 (1969). Shortly after the discovery of Nikkor lenses by American photo-journalists covering the Korean war, a photographer so equipped covered a rescue mission in South America. A 35 mm negative of the rescue scene was enlarged to make an 8 by 10 inch print. The print bore what the photographer thought was a dust spot, but when the negative was enlarged to billboard size, the spot was transformed into a picture of a helicopter. Assume this print was being used as an exhibit and was identified as an accurate representation of the rescue scene. Assume further that the identifying witness said he remembered the scene because he observed a solar reflection in the distance which was depicted in the photograph. Later, an expert identified the reflection as a helicopter. Does this latter testimony destroy the identification?

P.2d 120 (1970), we are nevertheless not persuaded by appellants' argument.

A hypothetical question must, in Washington, meet the requirements of the following rules:

(1) The hypothetical question must be based upon facts of record; if the question is not supported by the facts of record, it is objectionable.

(2) It should be phrased so as to fairly and comprehensively cover the facts upon which the answer will be based.

(3) If the answer assumes the existence of conditions or circumstances not shown by the evidence, its validity dissolves and it should be stricken.

(4) While the facts upon which the question is based may be subject to conflicting evidence, the answer is not rendered inadmissible if the question fairly incorporates the facts supported by evidence under the examiner's theory of the case.

*Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 150, 381 P.2d 605 (1963).

The questions asked respondents' witness read as follows:

Q Now, sir, I would like to have you assume that Mercury Comet, 1964 V-8 model, of which Exhibit 49 is a picture of the brake mechanism, was owned for about two years and driven and had no brake trouble;

That then it was seen fit to replace the brake shoes with new brake shoes, and for this purpose the brakes were dismantled and disassembled and the piston link pins and dust covers were removed and the inside walls of the individual wheel cylinders were checked for mud and wear and found to be in satisfactory condition, and that thereafter the brake shoes were installed, new brakes shoes of good quality, and the brakes reassembled and the lines bled, then the brakes tested, working, that is, to stop the car, and then the car being driven for some two to three weeks or thereabouts, after which the car stopped before entering an arterial highway at, let's say, 236th South, and then proceeded down a hill which was approximately five-tenths or one-half a mile long;

That after this trip had commenced down the hill the brakes were applied and there was no brakes, the pedal

went to the floor, and that the automobile ran into a telephone pole at a speed unrestricted by brakes;

That thereafter, within a day or two, the mechanic who had relined the brakes, thinking that there might have been a hydraulic cylinder blowout, went to the automobile, examined the insides of the wheels and brakes and found brake fluid thrown in an outward direction from the axle of the car on the inside of the tire and also found that there was no brake pedal pressure, and upon checking the hydraulic master cylinder, finding that there was no brake fluid therein, and after pumping the brake pedal, seeing that there was brake fluid coming out from between the backing plate and the brake drum, and then the car having been moved from the towing yard to the wrecking yard, and an investigator having caused the wheel to be removed and having taken this picture, Exhibit Number 49, I will ask you whether or not, sir, you have an opinion as to what occurred in the brake?

After the question was modified in several particulars to include other facts of record, the expert answered:

A My opinion is that in assembly the piston rod was not installed in its proper position on the web of the shoe; that in bleeding and adjusting the brakes, trying them out, the piston came out of the cylinder, contacted directly the web of the shoe, where it operated the brakes in a normal fashion for a period of time until the edge of the cylinder—the edge of the piston, got a notch worn into it from the steel web, and as it wore, it kept advancing more out of the end of the cylinder, and finally it gets into a position where the hydraulic pressure blew the seal open.

 Appellants contend that this question included the expert's testimony on exhibit 18 and was therefore improper. Assuming this to be the case, appellants' objection is not tenable. Expert testimony may be needed to interpret or explain photographs when the object of the photograph is one about which the jury does not commonly have knowledge. This is particularly true when the photograph itself cannot be relied upon absolutely as proof of the object represented. See *State v. Clark*, 156 Wash. 543, 287 P. 18 (1930); Annot., 77 A.L.R. 946 (1932); 31 Am. Jur. 2d,

*Expert and Opinion Evidence* § 153 (1967). The photograph here is admittedly not the best. Moreover, we doubt that the parts and operation of an automobile brake are within the common knowledge of a jury.

Rule 4 set out in *Helman*, 62 Wn.2d at 150, states that the facts upon which a hypothetical question is based may be subject to conflicting evidence. The source of the conflicting evidence may be the witnesses called by one of the parties, as here. *State v. Underwood*, 35 Wash. 558, 77 P. 863 (1904); R. Meisenholder, Evidence Law & Practice § 355 (1965). Thus, here there was a jury question as to whether or not the facts stated in the hypothetical are true, *i.e.*, whether Smith's interpretation of the photograph was correct as opposed to Hulit's interpretation. If the jury would find the facts untrue or not proven, it is their duty to disregard the opinion based thereon. For the reasons stated, the trial court did not err in allowing a hypothetical question to be asked of the expert witness which incorporated his analysis of exhibit 18.

■ A final aspect of appellants' challenge to the sufficiency of the evidence is the claim that no evidence was introduced on defendant Hopper's standard of care. Appellants seemingly equate a mechanic with a physician; thus, there must be evidence of the degree of skill possessed by other mechanics in the vicinity. Even as to medical malpractice cases, this is an incorrect statement of the law. *Douglas v. Bussabarger*, 73 Wn.2d 476, 478, 438 P.2d 829 (1968):

> In the absence of negligence so obvious that a layman can recognize it, *some* medical testimony is necessary to support a finding that the doctor departed from the standard of reasonable care. Often this requirement becomes a difficult, almost insurmountable obstacle for plaintiffs in malpractice suits when they encounter what has been termed the "conspiracy of silence." But none of the cases go so far as to require that malpractice be established *exclusively* by the testimony of doctors. If the rule is to have any rational justification at all, it should be limited to the requirement that, in those cases in which negligence is not apparent, *some* medical testi-

mony is necessary to establish the proper standard of care.

(Footnote omitted.) Much the same thought is stated in W. Prosser, Torts § 32 (3d ed. 1964):

> Where the matter is regarded as within the common knowledge of laymen, as where the surgeon saws off the wrong leg, or there is injury to a part of the body not within the operative field, it has been held that the jury may infer negligence without the aid of any expert.

(Footnotes omitted.)

In this case, the alleged negligence of defendant Hopper is the incorrect reassembly of the working parts of a brake mechanism. This is more nearly analogous to the surgical removal of the wrong leg than to the course of treatment where there are several alternatives. The alleged negligence here is so obvious that a layman can recognize it. There is no need for expert testimony concerning defendant Hopper's standard of care.

Having considered all the points raised on this appeal, we believe respondents showed sufficient evidence to make out a prima facie case against appellants. A new trial was properly ordered.

JAMES, C. J., and FARRIS, J., concur.