**SWENSON TRUCKING & EXCAVATING, INC., Appellant,**

v.

**TRUCKWELD EQUIPMENT COMPANY, Appellee.**

No. 4288.

Supreme Court of Alaska.

Jan. 4, 1980.

---

1. *See Hunter v. State*, 590 P.2d 888 (Alaska 1979).

**1114**

Joseph W. Sheehan, Fairbanks, for appellant.

Stephen D. Cramer, Merdes, Schaible, Staley & DeLisio, Inc., Fairbanks, for appellee.

Before CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

BOOCHEVER, Justice.

This case involves a grant of summary judgment for damages arising from a faulty ram assembly on a truck. We affirm the trial court's order granting summary judgment to Truckweld Equipment Co., the defendant, on plaintiff's strict liability, warranty and statutory misrepresentation claims. We reverse the summary judgment on plaintiff's negligence claim.

In August 1976, Swenson Trucking and Excavating, Inc., through its president Larry Swenson, purchased a used truck with a hydraulic ram assembly and dump box from Mack Truck of Seattle. Apparently, the basic component of a ram assembly is a cylinder which hydraulically hoists and lowers the dump box of the truck. Swenson wanted the truck for hauling ash. The dump box already on the truck was not suitable for that task. At Swenson's request, Truckweld Equipment Co., a Washington company in Seattle, designed a dump box suitable for hauling ash and installed it.[1] While Larry Swenson was driving the truck from Mack Truck to Truckweld's paint shop, he was in an accident, and the truck was wrecked. Swenson re-turned the truck to Truckweld. At Swenson's request, Truckweld took some parts off the truck, including the ram assembly and dump box, and put them on another truck which Swenson had obtained from Mack Truck.[2] Swenson also asked Truckweld to do some repair work on the ram assembly. Larry Swenson testified at his deposition:

Q. All right. So what happened then after this accident and after the damage was sustained?

A. We pulled it back to Truckweld, pulled the box off and I told them to check it over for—if there was any damage. And then I told them to go through and rebuild the cylinder and check it out completely.

. . . . .

. . . The cylinder itself has a bunch of oil rings, packings, different things like that in there. And I told them because it [the cylinder] was wrecked I wanted it completely checked out.

Truckweld's invoice for this work states: "CHECK & REPAIR CUSTOMER'S HYDRAULIC CYLINDER AS NECESSARY." (Capitalization in the invoice.) Truckweld rebuilt the internal mechanism of the cylinder, which involved replacement of the visible broken parts of the cylinder, i. e., the oil rings and packings. Apparently, Swenson did not analyze the sufficiency of the weld in the base plate of the ram assembly.

Swenson took the completed truck to Fairbanks where, from October 26, 1976 until December 4, 1976, the truck transported fly ash from the city power plant to the borough dump. On December 4, 1976, while operating the dump truck, "the thing collapsed." The truck was "totalled." Swenson has presented evidence that the cause of the wreck was a faulty weld in the original manufacture of the ram assembly.

---

1. Originally, Truckweld was simply going to design a cover for the dump box already on the truck. After Larry Swenson and Truckweld personnel discussed the matter, Swenson concluded a new box was necessary.

2. The invoice for the work indicates that Truckweld was to "[r]emove Customer's Body, Hydraulic System & Controls From Damaged Chassis [and] Install Body and Hydraulic System and Tailgate Controls with Higges on 'F' Model Mack."

The ram assembly was manufactured by Peabody Galion, an Ohio corporation.

Swenson sued Truckweld, claiming five theories of relief: negligence, breach of express warranty, breach of implied warranty, strict liability and violation of AS 45.50.-471.[3] Swenson does not claim any fault with the dump box or with Truckweld's work on the cylinder in the ram assembly. Swenson maintains, however, that Truckweld is liable for not discovering the faulty weld. The superior court granted Truckweld's motion for summary judgment on all five counts. Judgment was entered accordingly for Truckweld, and Swenson appeals.[4]

█ Civil Rule 56(c) provides that a motion for summary judgment shall be granted when the record indicates that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The court must draw all reasonable inferences in favor of the nonmoving party and against the movant. *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Co.,* 584 P.2d 15, 24 (Alaska 1978); *Nizinski v. Golden Valley Electric Association, Inc.,* 509 P.2d 280, 283 (Alaska 1973). Applying this standard, we hold that the trial court correctly granted summary judgment on all but Swenson's negligence claim.

## I. STRICT LIABILITY

█ Both parties accept section 402A of the Restatement (Second) of Torts (1965) as a correct statement of the applicable law on strict liability:

(1) One who *sells* any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the *seller* is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition *in which it is sold.* [emphasis added]

Comment "f" to that section states that the rule applies to "any manufacturer of such a product, to any wholesale or retail dealer or distributor." Alaska has adopted strict liability and follows the Restatement, with some exceptions.[5] *Butaud v. Suburban Marine & Sporting Goods, Inc.,* 555 P.2d 42, 44 (Alaska 1976). As we stated in *Clary v. Fifth Avenue Chrysler Center, Inc.,* 454 P.2d 244, 248 (Alaska 1969):[6]

The purpose of imposing such strict liability *on the manufacturer and retailer is to insure that the cost of injuries resulting from defective products are borne by the manufacturers that put such products on the market* rather than by the injured persons who are powerless to protect themselves. [emphasis added]

█ The basic reason why Truckweld is not strictly liable for the defect in the ram assembly is that Truckweld did not sell the ram assembly to Swenson or to anyone else. Truckweld agreed to repair the assembly and thus became liable for any negligent repair work. Strict liability generally ap-

---

3. *See* note 16 *infra* for pertinent text of AS 45.50.471.

4. Swenson also complains "that the trial court's decision is inadequate under the provisions of Civil Rule 56 which requires a specific finding that there are no genuine issues as to any material fact," and that "the trial court also fails to address the separate counts of Swenson's complaint." This contention is without merit: "in granting summary judgment it is unnecessary for the trial court to make findings in regard to the lack of any genuine issues of material fact to be litigated." *Palzer v. Serv-U-Meat Co.,* 419 P.2d 201, 205 (Alaska 1966). Alaska R.Civ.P. 52(a) exempts Rule 56

motions from the requirement of findings of fact and conclusions of law. We note that the trial court issued a memorandum decision which explains the basis of its decision.

5. We have rejected the requirement that the product be "unreasonably dangerous." *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871, 878 (Alaska 1979); *Cloud v. Kit Mfg. Co.,* 563 P.2d 248, 250 n. 2 (Alaska 1977); *Morrow v. New Moon Homes, Inc.,* 548 P.2d 279, 283 (Alaska 1976).

6. Quoted in *Cloud v. Kit Mfg. Co.,* 563 P.2d 248, 250 (Alaska 1977).

plies to products, not services.[7] What Truckweld agreed to do for Swenson was to perform the service of repairing the ram assembly.

Swenson's citation of decisions imposing strict liability on sellers of used vehicles [8] does not suggest to us that strict liability should be imposed on repairers of used vehicles. Arguably, a business that sells used products, like the manufacturer and the original retailer, "put[s] such products on the market." *Clary v. Fifth Avenue Chrysler Center, Inc.,* 454 P.2d 244, 248 (Alaska 1969). A repairer does not. Any claim of Swenson in strict liability would be brought against Peabody Galion, the manufacturer of the ram assembly, and Mack Truck, the seller of it.

We do not decide that a business that fabricates a vehicle or any product from used component parts, even if the customer contributes some of the parts, may not be the equivalent of a seller (either manufacturer or retailer) and hence strictly liable for defects in the completed product. The merchant would, however, have to do something more than sell an attachment for the vehicle, agree to put it on, and agree to repair the part of the vehicle that eventually breaks. Viewed most generously, Larry

Swenson's request that Truckweld repair or even "rebuild" the cylinder simply cannot transmute Truckweld into a manufacturer, retail seller, or distributor of a ram assembly that Swenson had previously purchased elsewhere.

We hold that Truckweld was not strictly liable in tort to Swenson.

## II. NEGLIGENCE

Swenson is entitled to maintain a negligence cause of action against Truckweld for any negligent work Truckweld performed. In *Pepsi Cola Bottling Co. v. Superior Burner Service Co.,* 427 P.2d 833 (Alaska 1967), we noted that a person's right to recover damages from the negligent repair of a boiler was "clearly established in law." *Id.* at 840. We quoted with approval section 404 of the Restatement (Second) of Torts:

> One who as an independent contractor negligently makes, rebuilds, or repairs a chattel for another is subject to the same liability as that imposed upon negligent manufacturers of chattels.

*Id.* at 840 n.22. Negligent conduct is that which breaches the actor's duty of due care, which is "the duty to act with that amount of care which a reasonably prudent person

7. *Pepsi Cola Bottling Co. v. Superior Burner Service Co.,* 427 P.2d 833, 839 & n. 21 (Alaska 1967); W. Prosser, Law of Torts § 104, at 679 (4th ed. 1971). Given the variety of possible commercial arrangements, we do not state that a seller of services may never be held strictly liable, although it is hard to imagine a "defect" in a service being something different from the service negligently performed. We also recognize the difficulty in some situations of determining whether something is a product or a service. *See, e. g., Note, Strict Liability— Whether the Transfusion of Blood to a Patient in a Hospital is a Service or the Sale of a Product,* 7 U.C.D.L.Rev. 196 (1974). We held in *Bachner v. Pearson,* 479 P.2d 319, 327 (Alaska 1970), that "the reasons for applying the doctrine of strict liability to manufacturers and retailers are equally valid in the context of leases."

8. *Turner v. International Harvester Co.,* 133 N.J.Super. 277, 336 A.2d 62, 69 (1975) ("safety of the general public demands that . . . the seller [of used cars] be responsible for safety defects").

Swenson also cites *Spillers v. Montgomery Ward Co.,* 294 So.2d 803 (La.1974). Although *Spillers* resembles this case in that the plaintiff paid to have his truck adapted for a specific commercial purpose (namely, pulpwood loading), the resemblance is superficial. First, the defendant in *Spillers* sold the product, a tag axle, which injured the plaintiff:

> [The defendant] did make the pulpwood loader and it did all the things necessary to adapt Spillers' truck for hauling pulpwood. It did supply a tag axle, and it was not required to use a sixteen year old rim on the wheel.

*Id.* at 807. Second, *Spillers* does not proceed on a theory of strict liability but on the failure of a duty of care. *Id.* at 807. Finally, the decision is questionable precedent for us because Louisiana follows Gallic civil law, M. Barham, *Methodology of the Civil Law in Louisiana,* 50 Tulane L.Rev. 474, 476–77 (1976), which treats the duties of sellers somewhat differently from Anglo-American common law. *See generally* W. Redmann, *Redhibition in Louisiana: Its Uses and Problems,* 50 Tulane L.Rev. 530, 533–35 (1976).

would use under same or similar circumstances." *Leigh v. Lundquist,* 540 P.2d 492, 494 (Alaska 1975) (footnote omitted).[9]

■ Truckweld points to evidence that the defect in the ram assembly could not have been discovered by visual inspection and argues that a visual inspection for defects in the ram assembly fulfilled its duty of care toward Swenson. It may well be that a jury will conclude that a visual inspection did fulfill Truckweld's duty of care toward Swenson, but we cannot say this is true as a matter of law.

■■ As we recently stated in *Carlson v. State,* 598 P.2d 969, 974 (Alaska 1979), "[w]hether particular conduct is reasonable under the circumstances is generally considered a question of fact for the jury." Among other things, the jury can consider evidence about the practice of other establishments in using more sophisticated inspection techniques and about the interaction between Larry Swenson and Truckweld personnel.

■ Evidence of industry practice is, of course, relevant but not determinative of due care. *See* W. Prosser, Law of Torts § 33 at 167–68 (4th ed. 1971). Swenson submitted evidence, which Truckweld did not dispute, that the defect in the ram was discoverable by sophisticated inspection techniques. Swenson also submitted the affidavit of Don Luterbach, owner and operator of D & D Industries,[10] who stated that the defect in the ram should have been discovered by Truckweld when it reinspected the ram after the accident and installed the ram on Swenson's second truck. And even if visual inspection were sufficient in the usual repair situation, the jury may find that, given Truckweld's knowledge about Swenson's truck (its previous accident and future use) and the conversations between Larry Swenson and Truckweld personnel,[11] a visual inspection did not fulfill Truckweld's duty of due care in this situation.[12] Our statement in *Webb v. City and Borough of Sitka,* 561 P.2d 731, 735 (Alaska 1977), applies here:

> As a general rule, issues of negligence are generally not susceptible to summary determination, but should be resolved by trial in the ordinary manner. The reason for this rule is:
>
> > [B]ecause of the elusive nature of the concept of negligence, the determination of the existence of which requires the forming of a judgment as to the reasonableness of the conduct of the parties in the light of all the circumstances of the case. If reasonable

---

**9.** Section 323 of the Restatement provides:
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting *from his failure to exercise reasonable care to* perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.
> Restatement (Second) of Torts § 323 (1965) (emphasis added).

**10.** Mr. Luterbach's affidavit asserts that in his business, he works a great deal with hydraulic systems (particularly hydraulic hoists for dump trucks), that he has a bachelor's degree in mechanical engineering, and that he has attended several hydraulic-oriented service schools. He also states that he examined the report of Arctic Testing Labs on the failure of the ram. These statements meet Truckweld's assertions that the Luterbach affidavit does not show he was competent to testify and had personal knowledge of what he testified about. *See* Alaska R.Civ.P. 56(e). Truckweld offers no evidence for its assertion that Luterbach's affidavit was made in bad faith.

**11.** In *Pepsi Cola Bottling Co. v. Superior Burner Service Co.,* as in this case, there was dispute
> as to what services appellee's employees were asked to perform in regard to the malfunctioning boiler; as to what appellee's employees undertook to accomplish in regard to the boiler; . . . . . .
> 427 P.2d at 835.

**12.** Winfield Beach, an expert deposed by Swenson, testified that "a reasonable type of quality control would be to monitor the thickness and the integrity of that weld because the strength of the device is dependent on that weld," and that use of X rays or ultrasound testing is "becoming an increasingly common tool" for quality control.

minds could draw different inferences and reach different conclusions from the fact the issue must be reserved for trial.[13]

## III. BREACH OF EXPRESS AND IMPLIED WARRANTIES

Counts II and III of Swenson's complaint alleged breach of express and implied warranties. Swenson claims that "the repairs requested by Swenson and the bill presented by Truckweld constituted a sales transaction within the definition of the Uniform Commercial Code." [14]

 The U.C.C. does not apply to this transaction. AS 45.05.046(a) (U.C.C. § 2106(a)) provides:

In §§ 36–242 of this chapter,[15] unless the context otherwise requires, "contract" and "agreement" are limited to those relating *to the present or future sale of goods.* "Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. *A "sale" consists in the passing of title from the seller to the buyer for a price* (§ 126). A "present sale" means a sale which is accomplished by the making of the contract. [emphasis added]

AS 45.05.094, .096, and .098, the Code's warranty provisions, expressly apply only to

sales of goods. Truckweld was not a seller of the defective ram assembly. Since Swenson claims no other basis for relief on its theory of breach of warranty, summary judgment was appropriate.

## IV. AS 45.50.471

 Swenson claims damages from alleged unfair trade practices committed by Truckweld, in violation of AS 45.50.-471(b)(4), (6), (12) and (15).[16] The dismissal of this claim was correct because the superior court lacked subject matter jurisdiction over the claim. AS 45.50.531 states:

Private and class actions. (a) A person who purchases or leases goods or services and thereby suffers an ascertainable loss of money or property, real or personal, as a result of another person's act or practice declared unlawful by § 471 of this chapter, may bring a civil action *in the judicial district in which the seller or lessor resides or has his principal place of business or is doing business,* to recover actual damages or $200, whichever is greater.

Truckweld's residence and principal place of business is in Washington state. Swenson makes no argument that Truckweld was "doing business" in Alaska within the meaning of AS 45.50.531.[17] We do not reach the question whether the ban against

---

**13.** *Quoting Gross v. Southern Ry. Co.,* 414 F.2d 292, 297 (5th Cir. 1969) (citations omitted).

**14.** The Alaskan version of the U.C.C. is codified at AS 45.05.

**15.** This refers to Article II, the "Uniform Commercial Code—Sales." Ch. 114, § 2.106, SLA 1962.

**16.** AS 45.50.471 provides, in pertinent part:
(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful.
(b) The terms "unfair methods of competition" and "unfair or deceptive acts or practices" include, but are not limited to, the following acts:

 (4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a

sponsorship, approval, status, affiliation, or connection that he does not have;

 (6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

 (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged;
 (15) knowingly making false or misleading statements concerning the need for parts, replacement, or repair service; . . . .

**17.** We do not imply a decision on whether Truckweld's association with Alaska—namely, repairing a product which Truckweld knew or

unfair trade practices contained in AS 45.-50.471 applies to acts committed outside the State of Alaska.

As we have discussed in section II of this opinion, there are triable issues of fact concerning Truckweld's duty of care to Swenson. Consequently, we reverse the trial court's grant of summary judgment on Swenson's negligence claim.

AFFIRMED in part, REVERSED in part, and REMANDED.

should have known would be used in Alaska—is sufficient to permit personal jurisdiction over Truckweld within Alaska's long arm jurisdiction statute, AS 09.05.015. *Compare Modern Trailer Sales, Inc. v. Traweek,* 561 P.2d 1192 (Alaska 1977) (defendant had insufficient contact with Alaska for personal jurisdiction), *with Jones Enterprises, Inc. v. Atlas Service Corp.,* 442 F.2d 1136 (9th Cir. 1971) (sufficient contact with Alaska for personal jurisdiction).