Donald SADDLER, Betty Saddler and Anthony Washington, Appellants,

v.

ALASKA MARINE LINES, INC., Appellee.

No. S-5235.

Supreme Court of Alaska.

July 30, 1993.

Rehearing Denied Aug. 26, 1993.

---

Frank J. Schlehofer, Law Office of William G. Azar, P.C., Anchorage, for appellants.

L.G. Berry, Robertson, Monagle & Eastaugh, Anchorage, for appellee.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS, and COMPTON, Justices.

## OPINION

MOORE, Chief Justice.

Donald Saddler and Anthony Washington, employees of Knik Construction, Inc. (Knik), were injured when a tank they were heating exploded. The tank contained one type of asphalt paving material; they mistakenly believed it contained another. They sued Alaska Marine Lines (AML), the common carrier who had pumped both materials into different empty tanks, on sever-

al theories. The superior court granted summary judgment in favor of AML on all claims. Saddler and Washington appealed the grant of summary judgment on two claims: strict products liability and negligence. We affirm the grant on the strict products liability claim, and reverse as to negligence.

## I. FACTS AND PROCEEDINGS

In 1989, Knik had an asphalt paving project at Bethel Airport. Knik employed Saddler and Washington[1] as laborers on the project. Their jobs were to heat and pump an asphalt paving material, AC–5. They were injured when a closed tank they were heating exploded. Apparently, the tank did not contain AC–5. Instead, it contained another paving material, CSS–1. CSS–1 has a much lower boiling point than AC–5.

Knik had ordered both the AC–5 and the CSS–1 from Chevron in Washington State. AML, a common carrier who transports freight to Alaska, was one of the designated delivering carriers of this shipment. Another carrier transported the materials from Chevron to AML's dock in Washington.

When the shipment arrived at AML's docks, AML pumped the materials into empty tanks owned by Knik. At the time the tanks were filled, AML was storing 25 to 50 of Knik's empty tanks on AML's dock. These tanks consisted of two types.[2] One type was square, with a 2500 gallon capacity. The other was round, with a 5000 gallon capacity. On this order, AML filled all of the available round containers with CSS–1 and placed AC–5 only in square containers. It also filled one square 2500 gallon tank, tank 03, with CSS–1. Tank 03 was the tank involved in the explosion. Prior to pumping, one of the empty round 5000 gallon containers AML was storing for Knik was rejected by the inspector.

This container would have held the amount of CSS–1 pumped into tank 03.

The parties dispute whether AML was supposed to pump only CSS–1 into round containers. In his affidavit, Saddler stated that after his injury, someone told him CSS–1 was supposed to be shipped in the round containers, not square ones. Saddler also relies on the fact that during this shipment, CSS–1 indeed was pumped only into round containers, with the exception of tank 03, which he alleges replaced the damaged round container. Finally, Saddler notes that the bill of lading for this order mistakenly represented that tank 03 contained AC–5, not CSS–1.

AML disputes the contention that it was supposed to pump CSS–1 only into round containers. Its representative stated that all types of asphalt materials were shipped in the square tanks. AML also contended that large shipments to Bethel required the use of all available tanks. Additionally, the Knik project manager stated that Knik had no requirement that a particular product be shipped in a particular type of tank.

The Knik manager also stated that the contents of each tank are labelled on the tank. Saddler alleges tank 03 was inadequately labelled because it was labelled on only two out of four sides. Finally, Saddler alleges that the labels should have included a warning about the boiling point of CSS–1.

Saddler brought suit against AML, alleging strict products liability due to failure to warn and negligence/negligent failure to warn.[3] AML moved for summary judgment on the products liability claim on the grounds it neither manufactured, distributed nor sold a product. It moved for summary judgment on the negligence claim on the grounds that it owed no duty to Knik's employees and that no causal connection

---

1. Saddler's and Washington's cases were consolidated. Betty Saddler, the wife of Donald Saddler, is also a party based on her loss of consortium claim. For the sake of convenience, all three plaintiffs collectively are called "Saddler."

2. A third type of tank, containing 2000 gallons, also existed. Whether Knik owned 2000 gallon

tanks is unclear from the record; however, this type of tank was not involved in this incident.

3. Saddler and Washington also alleged breach of express and implied warranties and defective product design. They do not appeal the entries of summary judgment on these claims.

existed between the plaintiffs' allegations and the accident. The superior court granted AML's motion on all claims.

## II. DISCUSSION

### A. Standard of Review

■ In reviewing a grant of summary judgment, we must determine whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Thorstenson v. ARCO Alaska, Inc.*, 780 P.2d 371, 374 (Alaska 1989). If the moving party establishes *prima facie* that it is entitled to judgment as a matter of law, the party opposing summary judgment must demonstrate that there exists a genuine issue of material fact to be litigated. *Id.* (quoting *Wassink v. Hawkins*, 763 P.2d 971, 973 (Alaska 1988)). In reviewing the grant of a motion for summary judgment we must take a view of the facts that most favors the nonmoving party. *Loyal Order of Moose, Lodge 1392 v. International Fidelity Ins. Co.*, 797 P.2d 622, 628 (Alaska 1990). When the superior court's order of summary judgment is without a statement of reasons, we will presume the superior court ruled in the movant's favor on all issues. "Accordingly, the summary judgment should be reversed only if no ground asserted supports the trial court's decision." *Reed v. Municipality of Anchorage*, 741 P.2d 1181, 1184 (Alaska 1987).

### B. Is AML Subject to Strict Products Liability?

■ AML argues that because it is a common carrier, it should not be subject to strict products liability. Saddler argues that AML is a "repackager" and should be strictly liable as such. AML is correct.

On the issue of strict products liability, we have adopted the Restatement (Second) of Torts § 402A (1965), with some exceptions.[4] *Swenson Trucking & Excavating,*

*Inc. v. Truckweld Equip. Co.*, 604 P.2d 1113, 1116 (Alaska 1980). According to the Restatement, the following are subject to strict products liability: sellers, manufacturers, wholesale or retail dealers and distributors. Restatement (Second) of Torts § 402(A), cmt. f (1965). Additionally, "strict liability applies to products, not services." *Swenson Trucking*, 604 P.2d at 1116–17 (repairer of truck ram assembly not held strictly liable as a matter of law).

Despite Saddler's arguments to the contrary, AML provided only a service to Knik. It performed the service of storing Knik's empty asphalt containers on its dock in Washington. When a shipment of asphalt materials was delivered from Chevron, the manufacturer, AML performed the service of pumping the asphalt into the containers. Finally, AML performed the service of shipping the filled containers to Alaska. At no time did AML sell, manufacture, deal or distribute the asphalt products.[5] Therefore, AML is not subject to strict products liability as a matter of law.

### C. Was Summary Judgment Inappropriate on the Question of AML's Negligence?

From the record, it appears the grounds for the grant of summary judgment in favor of AML were that AML owed Saddler no duty and that AML committed no negligent act which caused Saddler's injuries.

In *Swenson Trucking*, this court restated its position that

As a general rule, issues of negligence are generally not susceptible to summary determination, but should be resolved by trial in the ordinary manner. The reason for this rule is:

[B]ecause of the elusive nature of the concept of negligence, the determination of the existence of which requires the forming of a judgment as to the

---

4. For example, Alaska has rejected the requirement that the product be "unreasonably dangerous." *Swenson Trucking*, 604 P.2d at 1116 n. 5.

5. The Restatement (Second) of Torts § 402A applies to any person engaged in the business of selling products for use or consumption.

It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor....
Restatement (Second) of Torts § 402A cmt. f (1965).

reasonableness of the conduct of the parties in the light of all the circumstances of the case. If reasonable minds could draw different inferences and reach different conclusions from the fact the issue must be reserved for trial.

604 P.2d at 1118 (quoting *Webb v. City & Borough of Sitka,* 561 P.2d 731, 735 (Alaska 1977)).

Saddler advances three theories to support his position that AML owed him a duty of care. The first is the duty owed by bulk suppliers under the Restatement (Second) of Torts § 388 (1965) and case law. The second is the duty owed under the Restatement (Second) of Torts § 324A (1965) by one who negligently performs an assumed duty. The third is a duty of care based on policy considerations, using the factors set forth in *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.,* 628 P.2d 554 (Alaska 1981).

### 1. Duty Owed by Bulk Suppliers

■ Saddler argues that AML owed him the duty owed by bulk suppliers, either under the Restatement (Second) of Torts § 388, Chattel Known to be Dangerous for Intended Use,[6] or case law.[7] Saddler argues this duty should exist for policy reasons even if we determine that AML is not a bulk supplier.

Saddler's arguments are unpersuasive. As he notes in his brief, "supplier" already is defined quite broadly. It includes lessors, bailors, repairers, donors and lenders.

6. Section 388 of the Restatement (Second) of Torts (1965) states:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

Restatement (Second) of Torts § 388 cmt. c (1965). AML is none of these; it is a common carrier hired to perform a service. Common carriers should not be subjected to strict products liability; nor should they be included within the definition of bulk suppliers. We therefore conclude that AML does not owe Saddler the duty owed by bulk suppliers.

### 2. Duty Owed Under the Restatement (Second) of Torts § 324A

■ Saddler next alleges AML owes him the duty of care set forth in the Restatement (Second) of Torts § 324A, Liability to Third Person for Negligent Performance of Undertaking (1965). It reads:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*City of Kotzebue v. McLean,* 702 P.2d 1309, 1313 n. 4 (Alaska 1985) (quoting Restatement (Second) of Torts § 324A (1965)).

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

7. Saddler cites several cases that discuss the bulk sales doctrine. This doctrine sometimes provides bulk product manufacturers a defense in failure to warn products liability cases. *See Lakeman v. Otis Elevator Co.,* 930 F.2d 1547, 1551 (11th Cir.1991); *Rivers v. AT & T Technologies, Inc.,* 147 Misc.2d 366, 554 N.Y.S.2d 401, 403–04 (1990); *Groll v. Shell Oil Co.,* 148 Cal. App.3d 444, 196 Cal.Rptr. 52, 54–55 (1983). From these cases, Saddler infers a duty to warn owed by "repackagers"; however, this duty is inapplicable to AML, a common carrier outside the chain of distribution.

AML argues that it did not undertake to perform any services for the protection of Saddler. Drawing all reasonable inferences in favor of Saddler, as we must in reviewing a grant of summary judgment, *Swenson Trucking*, 604 P.2d at 1116, AML is incorrect.

It is reasonable to infer that AML undertook to perform several services for Knik which AML should have recognized were necessary to protect Saddler. Construing the facts in the light most favorable to Saddler, AML undertook to pump only AC–5 into square tanks.[8] AML also undertook to label tank 03, the square tank that contained CSS–1, labelling two sides of that tank. One reasonably could infer that such labelling was inadequate, especially if AML undertook to pump only AC–5 into the square tanks.[9] Finally, AML undertook to note the contents of the tanks on the bill of lading which accompanied the shipment; however, AML mistakenly noted on the bill of lading that tank 03 contained AC–5.[10] One reasonably could infer that the bill of lading error compounded the pumping and labelling errors, causing Saddler's injuries.[11]

Because material issues of fact exist concerning AML's duty under Restatement (Second) § 324A, summary judgment in favor of AML was inappropriate. We reverse and remand for the determination of the duty and causation factual issues.

### 3. Duty Based on Policy Considerations

▪ Saddler finally argues that AML owed him a duty based on the policy considerations set forth in *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554 (Alaska 1981).[12] Because we decide that material issues of fact exist concerning whether AML had a duty under the Restatement (Second) of Torts § 324A, we need not consider whether a duty also exists based on policy considerations.

## III. CONCLUSION

AML is a common carrier. It provides only a service; it neither sells, manufactures nor distributes a product. Therefore, AML is not subject to strict products liability, nor does it owe the duty of care owed by bulk suppliers. Material issues of fact exist as to whether AML owed Saddler a duty of care under the Restatement (Second) of Torts § 324A, the duty owed by performing an assumed duty. We reverse the grant of summary judgment in favor of AML on Saddler's negligence claim, and remand for a trial to resolve the duty and causation factual issues.

AFFIRMED in part, REVERSED and REMANDED in part.

---

**8.** From the record, a reasonable jury could infer that AML undertook to pump only AC–5 into square tanks either as a contractual duty or as a customary practice. A material issue of fact exists concerning this issue.

**9.** Whether the notice was adequate and whether any inadequacy in the notice provided was connected causally to Saddler's injury are material issues of fact. *Prince v. Parachutes, Inc.*, 685 P.2d 83, 89–90 (Alaska 1984).

**10.** *Compare Matomoco Oil Co., Inc. v. Arctic Mechanical, Inc.*, 796 P.2d 1336, 1339–40 (Alaska 1990).

**11.** Whether the bill of lading error causally was connected to Saddler's injury is a material issue of fact.

**12.** The factors are (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty the plaintiff suffered injury, (3) the closeness of the connection between the defendant's conduct and the plaintiff's injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden to the defendant and consequences to the community of imposing the duty, and (7) the availability, cost and prevalence of insurance for the risk. *D.S.W.*, 628 P.2d at 555.